**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) |
| | ) Criminal No. 20-218 |
| PATRICIA MURRIETTA, | ) |
| | ) |
| Defendant. | ) |

## <u>MEMORANDUM OPINION</u>

Presently before the Court is the Government's motion pursuant to 18 U.S.C. § 3145(a)(1) seeking revocation of a release order issued by United States Magistrate Judge Erik J. Markovich in the District of Arizona, which is opposed by Defendant Patricia Murrietta. (*See* Docket Nos. 132, 453, 460, 467). After careful consideration of the parties' positions, review of the detention hearing transcript, the referenced Pretrial Services Report, and additional evidence received at the hearing held on January 7, 2021, (Docket Nos. 445-1, 445-2, 454-1, 469-1, 469-2, 483, 520, 520-1, 520-2, 520-3, 520-4, 520-5), the Government's motion will be granted and detention will be ordered. The following includes the Court's findings of fact and statement of the reasons for detention as required by 18 U.S.C. § 3142(i)(1).

## I.     <u>BACKGROUND</u>

### A.  <u>PROCEDURAL HISTORY</u>

On August 25, 2020, Defendant and 26 other co-defendants were charged in Count One of the Indictment in this case with conspiracy to possess with intent to distribute and distribute 5 kilograms or more of cocaine, in violation of 21 U.S.C. § 846, for conduct occurring from in and around October 2018 until in and around June 2020. (Docket No. 3). An arrest warrant was issued for Defendant on that same date. (Docket No. 24).

As outlined in the Government's motion, Defendant surrendered to the United States Marshals Service in the District of Arizona on September 3, 2020, she had an initial appearance there and was ordered to be detained pending a detention hearing.  (Docket No. 132 at 2). Following a hearing held on September 10, 2020,  Magistrate Judge Markovich denied the Government's request that Defendant be detained pending trial and ordered her release on an unsecured personal recognizance bond with conditions.[1]  (Docket Nos. 225-4, 225-5).  At the Government's request, Magistrate Judge Markovich stayed the release order until 5 p.m. PST that day to permit the Government to file a motion to revoke the release order.  (Docket No. 225-4).

On September 10, 2020, the Government filed with this Court an emergency motion for a stay and revocation of the release order pursuant to 18 U.S.C. § 3145(a)(1).  (Docket No. 132).  In sum, the Government represented that Defendant "is subject to a rebuttable presumption in favor of detention.  She is unable to rebut it.  The charges against her are serious, her involvement in the conspiracy was significant, and the weight of the evidence is strong.  Defendant's drug-trafficking activity represents her only tie to the Pittsburgh area, where this case is pending.  [Defendant's] release would pose a serious danger to the community.  It would also give rise to an intolerable risk of flight, which could be aided by several conspirators who have thus far managed to evade law enforcement."  (*Id.* at 10).  On that same date, this Court granted the Government's motion as to its request that the release order be stayed and further ordered that Defendant shall remain in the custody of the United States Marshals Service and be transported forthwith to the Western District of Pennsylvania for further proceedings on the Government's request that she be detained pending trial or other disposition.  (Docket No. 143).

---

1        The release was conditioned on, *inter alia*, Defendant remaining in Arizona, except to travel to and from this District as required for court appearances.  (*See* Docket No. 225-5).

Following Defendant's arrival in this District, she was arraigned on December 11, 2020 and pled not guilty to the charge. (Docket Nos. 430, 431). In response to the Court's order directing the parties to file a status report, the parties indicated that they wished to submit briefs on the Government's motion to revoke the release order, proposed a briefing schedule which the Court adopted, and Defendant requested a hearing which was held by video conference on January 7, 2021. (Docket Nos. 450, 458, 519).

On December 18, 2020, Defendant filed her brief in opposition to the Government's motion to revoke, in which she concedes that the rebuttable presumption of detention applies in this case, but contends that she rebutted it and she should be released pending trial because she is not a danger to the community or a flight risk. (Docket No. 453). Defendant suggests that any concerns regarding her pretrial release can be alleviated because her 22-year old daughter, Brigett Murrietta, is willing to serve as a third-party custodian and an electronic monitoring condition can be imposed. (*Id.* at 9, 10). Additionally, Defendant submitted letters from her daughter and her cousin, Jessica Mendez, attesting to her good character. (Docket Nos. 469-1, 469-2).

On December 21, 2020, the Government filed a memorandum in support of its motion to revoke the release order, pointing out that the rebuttable presumption of pretrial detention applies and the relevant factors in 18 U.S.C. § 3142(g) mandate detention. (Docket No. 460 at 15-20). In support, the Government maintains that it has strong evidence demonstrating that Defendant was part of an elaborate, multi-national drug trafficking organization ("DTO") responsible for distributing more than 100 kilograms of cocaine obtained from a source of supply in Mexico and sold by its members operating in Pennsylvania, California, Arizona and other states. (*Id.* at 6, 16). As for Defendant's role, the Government submits that she was responsible for transporting narcotics proceeds for the DTO's Los Angeles-based distributors to Mexico. (*Id.* at 16). As such,

the Government contends that Defendant is both a danger to the community given the serious nature of the drug trafficking offense and a flight risk because she has no ties to the Western District of Pennsylvania, she faces a substantial penalty if convicted and she may seek refuge in Mexico, where she routinely travels. (*Id.* at 18-19). Along with its memorandum, the Government submitted six exhibits, which will be discussed in detail below. (Docket Nos. 520, 520-1, 520-2, 520-3, 520-4, 520-5).

On December 23, 2020, Defendant filed a reply in further support of her arguments for release. (Docket No. 467). She also adopted the reply in support of release previously filed by co-defendant Manuel Murrietta at Docket No. 445, including the following exhibits attached thereto: (1) a letter from Mayor Arturo R. Garino of Nogales, Arizona explaining that residents of border communities likes Nogales, Arizona where Defendant is from frequently travel to Mexico for a variety of purposes; and (2) a chart compiling 2019 federal pretrial violations nationwide. (Docket Nos. 445-1, 445-2, 474).

## B. **EVIDENCE ADDUCED AT THE HEARING**[2]

At the January 7th hearing, the Government relied on the testimony of Drug Enforcement Administration Special Agent ("SA") Michael Johns, who is one of the lead agents in the investigation of this case.[3] SA Johns' testimony was based on his personal knowledge, including his review of Title III wiretap intercepts, and information relayed to him by other investigating agents. Through SA Johns' testimony, the Government entered into evidence the following six

---

[2]     An official transcript of the hearing has not been produced as of this date. Therefore, the Court summarizes the testimony presented from its notes of the proceeding and by reference to the exhibits admitted into evidence.

[3]     SA Johns testified that during his career with the DEA which began in 2002, he has participated in investigations ranging from street-level drug dealing to high level narcotics trafficking, as well as Title III wiretap investigations, and he is familiar with communication modes and methods utilized by DTOs. In this Court's estimation, SA Johns presented as an experienced agent and, based on his demeanor and testimony in response to the questioning of the attorneys, he offered credible testimony concerning the investigation of this case.

exhibits: (1) an excerpt from an Affidavit in Support of an Application for an Order Authorizing the Interception of Wire and Electronic Communications dated February 20, 2020 by SA Christopher J. Kline of the United States Postal Service – Office of Inspector General ("Govt. Ex. 1"); (2) a draft transcription of a series of intercepted calls on February 11, 2020 among Defendant and co-defendants Manuel Silvestre and Johnny Bravo ("Govt. Ex. 2"); (3) a DEA report of investigation dated February 19, 2020 regarding surveillance of Bravo and the identification of Defendant and co-Defendant Manuel Murrietta on February 11, 2020 ("Govt. Ex. 3"); (4) a series of 12 surveillance photographs of Bravo, Manuel Murrietta and Defendant on February 11, 2020 ("Govt. Ex. 4"); (5) a draft transcription of an intercepted telephone conversation between Silvestre and an individual called "El Plebe" which is undated ("Govt. Ex. 5"); and (6) United States Customs and Border Protection records pertaining to Defendant for the time period from May 20, 2019 until September 1, 2020 ("Govt. Ex. 6").  (Docket Nos. 520, 520-1, 520-2, 520-3, 520-4, 520-5).

By way of background, SA Johns explained that the investigation focused on the trafficking of cocaine from Mexico into the United States, including Pennsylvania, Los Angeles, California and Tucson, Arizona.  Relevant here, wiretaps were utilized on nine Target Telephones ("TT") during the period from November 2019 until June 2020.  Based on information set forth in Govt. Ex. 1,[4] the Court authorized the interception of communications over TT #1 and TT #4 utilized by co-defendant Jamaal Maragh, who was identified as the main operative for the DTO in the Pittsburgh area, as well as TT #5 used by Silvestre and TT #6 used by Bravo.  (Docket No. 520, ¶¶ 32, 33, 35).  Bravo acted as a distributor/courier of narcotics and drug proceeds for the DTO's unidentified source of supply in Mexico, and he worked in concert with Silvestre, who was a high-

---

4        SA Johns adopted Govt. Ex. 1 as part of his testimony.

ranking member of the DTO based in Los Angeles and was involved in distributing kilogram-quantities of cocaine and collecting large sums of drug proceeds. (*Id.*, ¶¶ 37, 38). Both Silvestre and Bravo were observed by law enforcement accessing a store called Gutierrez Produce located at 741 Kohler Street in Los Angeles, which was a stash house for the DTO. (*Id.*, ¶ 38).

Agents intercepted calls between Maragh and the unidentified source of supply in Mexico discussing the supply of cocaine and payment for same. (Docket No. 520, ¶¶ 53, 83, 84). Agents also intercepted calls among Maragh, Silvestre and Bravo during which they coordinated a money drop on February 4, 2020 and discussed the pricing and payment for drugs. (*Id.*, ¶¶ 89-99). In other intercepted communications on February 5, 2020, Maragh ordered kilograms of cocaine from Bravo and the two discussed payment, including the fact that the money was ultimately intended for the unidentified Mexican source of supply. (*Id.*, ¶¶ 102-112). Additionally, agents intercepted communications on February 7, 2020 during which Lupita, later identified as co-defendant Lucien Burton, ordered two kilograms of cocaine and agreed to pay Silvestre and Bravo for it. (*Id.*, ¶¶ 113-116). Other intercepted communications on February 7th involved discussions among Silvestre, Bravo and an unknown individual identified as "Kunta" indicating that Kunta had paid $192,000 for narcotics. (*Id.*, ¶¶ 117-121, 127-131). According to the Government, the intercepted communications show that Bravo and Silvestre distributed drugs on behalf of the Mexican source of supply to Maragh and others and collected related drug proceeds on his behalf. (Docket No. 460 at 11).

Next, SA Johns testified that Govt. Ex. 2 is a series of calls intercepted on February 11, 2020 among Defendant, Silvestre and Bravo. In the first call between Silvestre and Defendant, she identified herself as "Shakira, on behalf of Negro," (Docket No. 520-1 at 2), which, according to SA Johns, indicates that Defendant identified herself as acting on behalf of the unidentified

Mexican source of drug supply to the DTO.[5]  During this call, Silvestre said that he could meet in about one hour and advised he would contact "Kambulli."  (*Id.* at 3).  In a subsequent intercepted call between Silvestre and Bravo, Silvestre referred to Bravo as "Kambulli" and stated that "I am here already I will tell you something soon to give the check to Shakira." (*Id.* at 4).  SA Johns explained that during this call, Silvestre directed Bravo to meet Defendant and deliver drug proceeds to her.  Agents next intercepted a call between Silvestre and Defendant, during which he asked if the meeting could be arranged for 10:00 a.m. PST.  (*Id.* at 6).  Thereafter, in another intercepted call between Silvestre and Defendant, she indicated that she was at the taco place on 10th.  (*Id.* at 7).  Finally, in a subsequent call between Bravo and Defendant, she indicated that she was waiting for him and eating some taquitos "[r]ight here at the same place.  On the 10th. . . . [w]here the liquor store is."  (*Id.* at 8).  SA Johns testified that this expression indicated that Defendant had met Bravo at the same location in the past.

SA Johns next testified concerning Govt. Ex. 3, which is a DEA Report of Investigation regarding surveillance of Defendant and co-defendants Bravo and Manuel Murrietta conducted on February 11, 2020.  In sum, during this surveillance, agents observed a meeting among Defendant, Manuel Murrietta and Bravo during which Bravo provided Manuel with a black backpack believed to contain an undetermined amount of drug proceeds.  (Docket No. 520-2 at 2, 4).  More specifically, at 9:10 a.m. on February 11th, SA Kline advised agents in California of intercepted calls indicating that Silvestre, Bravo and UF7894, later identified as Defendant, were arranging to meet at 10:00 a.m. that day.  (*Id.*, ¶ 1).  At approximately 9:10 a.m. on February 11th, electronic

---

[5]      SA Johns testified that Govt. Ex. 5 is an intercepted call between Silvestre and El Plebe during which El Plebe told Silvestre that he had given Silvestre's telephone number to someone who would call him "on behalf of El Negro."  (Docket No. 520-4 at 2).  Silvestre questioned what the individual would say, and El Plebe again explained that he would call Silvestre on El Negro's behalf, reiterating that the "[s]aying is on behalf of El Negro."  (*Id.*).  SA Johns testified that the phrase "on behalf of El Negro" is significant because Defendant identified herself in the same manner to Silvestre during the intercepted call on February 11, 2020, which shows that the phrase was an access code used by those involved with the DTO.

surveillance determined that Silvestre arrived at a stash warehouse located at 741 Kohler Street in Los Angeles used by the DTO, and agents initiated surveillance at that location. (*Id.*, ¶¶ 2, 3). At 9:50 a.m. that morning, SA Kline told investigators that Silvestre was going to send Bravo to meet with Defendant. (*Id.*, ¶ 4). In a subsequent intercepted call, Bravo and Defendant agreed to meet by the Dream Market liquor store, which is in close proximity to 741 Kohler Street. (*Id.*).

At 10:00 a.m. that morning, an agent observed a female, later identified as Defendant,[6] along with a male, later identified as Manuel Murrietta, sitting at a taco stand next to the Dream Market. (Docket No. 520-2, ¶ 5). Additionally, at 10:00 a.m., Bravo was seen leaving 741 Kohler Street in a white Ford cargo van and arriving at the Dream Market parking lot behind the taco stand. (*Id.*, ¶ 6). An agent observed Defendant and Manuel Murrietta walk toward Bravo's vehicle, Manuel Murrietta approached Bravo while Defendant remained in the driveway area near the parking lot, Bravo exited the van and gave Manuel a black backpack. (*Id.*). Manuel Murrietta took the backpack, walked across the street and followed Defendant to a parked silver Chrysler van, which investigators determined was registered to her at 60 Madison Street, Nogales, Arizona. (*Id.*). An agent saw Defendant unlock the van and open the driver's side door for Manuel Murrietta, who then opened the rear driver's side door and placed the backpack in the back seat. (*Id.*). Manuel Murrietta entered the driver's side and Defendant entered the front passenger side of the van. (*Id.*). After that, agents observed Bravo leave the area and follow the Murrietta's van to eastbound Interstate-10. (*Id.*, ¶ 7).

As SA Johns explained, Govt. Ex. 4 is a series of 12 surveillance photographs of Bravo, Manuel Murrietta and Defendant on February 11, 2020. The photographs depict Defendant eating at an outdoor taco stand, walking behind Manuel Murrietta toward the Dream Market liquor store,

---

6    SA Johns testified that Defendant was identified by making a comparison with her driver's license and vehicle registration.

Bravo exiting a van, providing Manuel Murrietta with a black backpack, Manuel returning to a silver van with Defendant, opening the rear driver's side door of the vehicle and placing the backpack inside.   (Docket No. 520-3).

Finally, SA Johns testified that Govt. Ex. 6 is a record of Defendant's inbound travel from Mexico to the United States compiled by United States Customs and Border Protection, which shows that she made 97 trips from Mexico to the United States during the period from May 20, 2019 through September 1, 2020.  (Docket No. 520-5).  SA Johns explained that Govt. Ex. 6 shows that Defendant crossed the border from Mexico to the United States on February 12, 2020, which was one day after she and Manuel Murrietta met with Bravo in Los Angeles.  (*Id.* at 3).  Given the intercepted communications on February 11th, SA Johns testified that Defendant's travel from Mexico to the United States on February 12th was significant and indicates to him that Defendant effectuated the transfer of drug proceeds from Los Angeles to a source in Mexico, although he did not know the amount of drug proceeds involved.

Defendant presented testimony by her daughter, Brigett Murrietta, who is willing to serve as a third-party custodian if she is released.  Ms. Murrietta testified that the family has other relatives living in Nogales, Arizona including her grandmother, grandfather, uncle and aunt, Jessica Mendez, who appeared by video at the January 7th in support of Defendant.  As noted, Defendant also proffered character letters from Ms. Murrieta and Ms. Mendez.  (Docket Nos. 469-1, 469-2).  Additionally, Defendant proffered a letter from Mayor Garino explaining that "the majority of residents on both sides of the border frequently travel between [Nogales, Arizona and Nogales, Mexico]" for dining, nightclubs, grocery shopping, and to visit family, along with a pretrial services violation summary report  for 2019.  (Docket Nos. 445-1, 445-2).

After  reviewing  the  transcript  of  the  detention  hearing  before  Magistrate  Judge

Markovich, considering the Pretrial Services Report, the supplemental information and evidence presented at the hearing and the arguments of counsel, the Court concludes, for the reasons detailed here, that there is no condition or combination of conditions which will reasonably assure Defendant's appearance as required and the safety of the community if she is released.

## II.    LEGAL STANDARD

The Bail Reform Act of 1984, 18 U.S.C. § 3141, *et seq.* (the "BRA"), governs release and detention pending judicial proceedings.   Pursuant to 18 U.S.C. § 3145(a)(1), "[i]f a person is ordered released by a magistrate judge, or by a person other than a judge of a court having original jurisdiction over the offense and other than a Federal appellate court . . . the attorney for the Government may file, with the court having original jurisdiction over the offense, a motion for revocation of the order or amendment of the conditions of release. . . ."  A district court exercises *de novo* review over a release order entered by a magistrate judge.[7]  *United States v. Delker*, 757 F.2d 1390, 1394 (3d Cir. 1985).  A district court may incorporate the transcript of the proceedings before the magistrate judge, as this Court did at the January 7th hearing.  *See United States v. Chagra,* 850 F. Supp. 354, 357 (W.D. Pa. 1994).  The Court "may also consider any additional evidence or proffers submitted in conjunction with any supplemental proceedings," which it has done here.  *Burgess*, 2009 WL 2038148, at *1 (citation omitted).

As noted, the availability of pretrial release is controlled by the BRA, which provides that a defendant must be released on her personal recognizance or upon execution of an unsecured appearance bond unless the court determines that "such release will not reasonably assure the

---

7       Although the Court held a hearing in this case, it is well-established that "[d]e novo review does not require an additional evidentiary hearing[,]" and the district court "may make its independent determination based solely upon the evidence introduced at the prior hearing."  *United States v. Kolonis*, No. 2:20-cr-0146, 2020 WL 5253192, at *3 (W.D. Pa. Sept. 3, 2020) (quoting *United States v. Burgess*, No. 2:09-cr-150, 2009 WL 2038148, at *2 (W.D. Pa. July 8, 2009)); *see also United States v. Bastianelli*, Crim. No. 17-305, 2018 WL 1015269, at *4 (W.D. Pa. Feb. 22, 2018) ("The Court retains the discretion to make its determination after reviewing the record developed before the U.S. Magistrate Judge or to accept additional evidence from the parties and rule on the expanded record.").

appearance of the person as required or will endanger the safety of any other person or the community."  18 U.S.C. § 3142(b).  Following a hearing, if the judicial officer finds that no condition or combination of conditions of release will reasonably assure the defendant's appearance and the safety of the community, detention must be ordered.  18 U.S.C. § 3142(e)(1). In determining whether there are conditions of release that will reasonably assure the defendant's appearance and the safety of the community, the judicial officer must consider the § 3142(g) factors concerning:

> (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device;
>
> (2) the weight of the evidence against the person;
>
> (3) the history and characteristics of the person, including--
>
>> (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and
>>
>> (B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and
>
> (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

18 U.S.C. § 3142(g).

Certain cases raise a rebuttable presumption that no condition or combination of conditions will reasonably assure the appearance of the defendant as required and the safety of the community. 18 U.S.C. § 3142(e)(3).  This rebuttable presumption applies to cases, among others, in which

there is probable cause to believe that the defendant committed an offense under the Controlled Substances Act, 21 U.S.C. § 801, *et seq*., for which the maximum term of imprisonment is ten years or more.  18 U.S.C. § 3142(e)(3)(A).  An indictment charging a defendant with committing an offense enumerated in § 3142(e)(3) is sufficient to establish probable cause triggering the rebuttable presumption.  *United States v. Suppa*, 799 F.2d 115, 119 (3d Cir. 1986).

A defendant may rebut the presumption in § 3142(e) by producing "some credible evidence . . . that he will appear and will not pose a threat to the community."  *United States v. Carbone*, 793 F.2d 559, 560 (3d Cir. 1986).  The defendant's burden of production is relatively light and has been construed as easy to meet.[8]  *Chagra*, 850 F. Supp. at 357 (citation omitted).  If rebutted, however, the presumption does not disappear but rather "remains in the case as an evidentiary finding militating against release, to be weighed along with other evidence relevant to factors listed in § 3142(g)."  *Id.* at 358 (citation omitted).  If the defendant rebuts the presumption, the burden of persuasion remains with the Government.  *Id.* at 357.  Thus, the Government bears the burden of proving that the defendant presents either a risk of flight or a danger to the community.[9]

## III.   DISCUSSION

As an initial matter, Defendant is charged in Count One of the Indictment with conspiracy to possess with intent to distribute and distribute 5 kilograms or more of cocaine, which carries a penalty of not less than ten years and up to life imprisonment.  *See* 21 U.S.C. § 841(b)(1)(A)(ii).

---

[8]   To rebut the presumption that the defendant presents a danger to the community, "he must come forward with some credible evidence that he will not continue to engage in the drug activities with which he has been charged." *Chagra*, 850 F. Supp. at 358 (citations omitted).  This may be accomplished through "'testimony by co-workers, neighbors, family physician, friends, or other associates concerning the arrestee's character, health, or family situation.'" *Suppa*, 799 F.2d at 120 (quoting *United States v. Perry*, 788 F.2d 100, 115 (3d Cir. 1986)).

[9]   The Government must prove by a preponderance of the evidence that the defendant is a flight risk and that no condition or combination of conditions will assure his appearance at trial. *United States v. Himler*, 797 F.2d 156, 161 (3d Cir. 1986).  The Government must prove by clear and convincing evidence that a defendant is a danger to the safety of any other person or the community. *Delker*, 757 F.2d at 1399.

Defendant does not dispute that this charge raises the rebuttable presumption that no condition or combination of conditions will reasonably assure her appearance and the safety of the community. (*See* Docket No. 453 at 4).

Defendant attempts to rebut this presumption by proffering evidence of the following: she has no criminal history; she has significant ties to the community in Nogales, Arizona where she has resided with her immediate family since 2000; she previously was gainfully employed prior to the COVID-19 pandemic and she assists her husband managing rental properties; and, despite her admitted twice monthly travel to Mexico, she posits that such travel is common for individuals who reside near the border for shopping, entertainment, dining and even medical treatment, as explained by Mayor Garino in his letter upon which she relies.  (*See* Docket Nos. 445-1; 453 at 8; 467 at 4).  Defendant also submitted letters from her daughter, Ms. Murrietta, and her cousin, Ms. Mendez attesting to her good character.  (*See* Docket Nos. 469-1, 469-2).  Ms. Murrietta testified that she is willing to serve as a third-party custodian for Defendant if she is released, and Defendant suggests that an electronic monitoring condition can be imposed.  (Docket No. 453 at 9, 10). Overall, Defendant submits that her background and characteristics demonstrate that she is not a danger to the community or a flight risk.  (*See* Docket Nos. 453 at 9-10; 467 at 4-6).

Even if Defendant's proffered information and evidence satisfies her burden to rebut the applicable presumption, the Court nonetheless concludes that the Government has  presented clear and convincing evidence that Defendant is a danger to the safety of the community and has proven by a preponderance of the evidence that she is a flight risk.  In reaching these decisions, the Court has conducted an independent examination of the record as a whole and balanced the four factors set forth in 18 U.S.C. § 3142(g).  For reasons that follow, the Court finds that the available information and evidence on each of those factors weigh in favor of detention.

A.   **Nature and Circumstances of the Offense Charged**

The Government submits that this case arises from the investigation of a DTO which was responsible for distributing more than 100 kilograms of cocaine that was obtained from a source of supply in Mexico and sold by members of the organization in Pennsylvania, California, Arizona and other states.  (Docket No. 460 at 6).  For Defendant's part, she allegedly transported drug proceeds associated with the DTO's cocaine trafficking activities from the United States to Mexico.  As a result of Defendant's alleged involvement, she has been indicted on a charge of conspiracy to possess with intent to distribute and distribute 5 kilograms or more of cocaine, which is a very serious controlled substance offense.  (Docket No. 3).  If convicted, she faces a statutory mandatory term of not less than 10 years and up to life imprisonment.  In light of this, the nature and circumstances of the offense charged weigh strongly in favor of pretrial detention.

B.   **Weight of the Evidence**

As a general matter, the Court observes that the weight of the evidence against Defendant is strong, as reflected by the grand jury's return of the  Indictment which establishes probable cause that the offense occurred.  More specifically, while Defendant is presumed innocent of the charged offense, the Government's evidence strongly suggests that Defendant was not only involved in the conspiracy, but she played an important role in the DTO as a courier of drug proceeds.

The Government's proffered evidence shows that co-defendants Silvestre and Bravo were distributing narcotics for an unidentified source of supply in Mexico and collecting related drug proceeds.  Through intercepted calls and physical surveillance, it was determined that Silvestre arranged a meeting and directed Bravo to transfer drug proceeds to Defendant and her husband, co-defendant Manuel Murrietta, which occurred on February 11, 2020.  According to United States Customs and Border Protection records pertaining to Defendant, she crossed the border from

14

Mexico to the United States on February 12th, the day after that meeting. (*See* Docket No. 520-5 at 3). The Government submits that Defendant's travel corroborates its evidence that she acted as a courier on behalf of Silvestre, Bravo and their unidentified Mexican supplier of cocaine to transport drug proceeds from the United States to Mexico. Overall, the Government possesses significant evidence of Defendant's involvement in the DTO, particularly as to the events of February 2020. In sum, while recognizing that Defendant is presumed innocent of the charged offense, the weight of the evidence against her favors pretrial detention.

### C.  History and Characteristics of Defendant

As to Defendant's background and characteristics, she is 49 years old, she was born and raised in Navojoa, Sonora, Mexico, she relocated to Nogales, Arizona in 2000, where she has remained since, and she became a naturalized United States citizen in 2005.[10] Defendant is one of 13 children born to her parents who were citizens of Mexico. Both of her parents are deceased and her living siblings all reside in Mexico, though she reported no contact with them in over a year.

Defendant has been married to Manuel Murrietta, who is a co-defendant in this case, for 23 years. They have two children, ages 22 and 14. Defendant has resided at her current address in Nogales, Arizona for four years with her husband and their teenage son. Defendant's daughter, Brigett Murrietta, who is a college student, spoke with the Pretrial Services Officer to verify the information contained in the Pretrial Services Report. As noted, Ms. Murrietta wrote a letter

---

10      Defendant's background, residence, family ties, employment history, physical and mental health, substance abuse history and criminal history are described in the Pretrial Services Report prepared in the District of Arizona. The Court notes that neither party has objected to the contents of this Report relative to Defendant's history and characteristics as detailed therein.

attesting to Defendant's good character, as did Defendant's cousin, Ms. Mendez.  (*See* Docket Nos. 469-1; 469-2).

To Defendant's credit, she does not have any criminal history.  Pretrial Services was unable to obtain information concerning her physical and mental health or any issues with substance abuse, but her daughter indicated that there are no concerns in any of these areas.

Prior to the COVID-19 pandemic, Defendant was self-employed for six years managing a food cart, and she previously had periods of employment with various retail stores.  Defendant and her husband receive rental income from several properties they own and rent or manage in Nogales and Rio Rico, Arizona.  Defendant owns her current residence at E. Madison Street in Nogales where she lives in an apartment and rents additional space there to two businesses for which she receives rental income of $600 and $550 per month, respectively.  Defendant owes approximately $1,900 in back taxes on this property.  She also owes a monthly mortgage payment of $390 for a second property on W. Wise Street in Nogales, which she rents for $600 per month, and she manages a third property in Rio Rico owned by her mother-in-law, where she rents three apartments for a combined monthly amount of $800.  Defendant owes $1,800 in back taxes on this third property.  Additionally, Defendant has $1,500 in credit card debt for which she makes a $70 monthly payment, she has a $28,000 automobile loan with a monthly payment of $500, and $300 per month in car insurance.  Defendant's daughter indicated that she also assists her with her monthly rent of $500.

Despite Defendant's history of employment and receipt of monthly rental income, the Court is concerned that the collective financial burden of her mortgage debt, back taxes, other required monthly expenses and assistance toward her daughter's rent could tempt her to return to the illegal activity with which she has been charged.  This concern is exacerbated by the fact that

the food cart Defendant managed was closed for four months prior to her self-surrender in this case and there is no present indication of another prospective job opportunity.

As to community ties, it is appropriate to consider whether a defendant has ties to the district where the prosecution is pending. *See United States v. Bucio*, Crim. No. 5:17-055-DCR, 2019 WL 4397334, at *3 (E.D. Ky. Sept. 13, 2019) (the defendant's lack of any community, financial, family or employment ties to the district where prosecution was pending weighed in favor of revoking release order); *United States v. Villegas*, No. 3:11–CR–28, 2011 WL 1135018, at *7 (E.D. Tenn. Mar. 25, 2011) ("[A]lthough the defendant has ties with the community in which he lives in California, the defendant has no ties with this District, and the Court may consider this fact.") (citing *United States v. Townsend*, 897 F.2d 989, 995 (9th Cir. 1990) (finding that "community" embraces ties to the community in which the charges are brought and the community in the United States to which the defendant has ties)); *United States v. Rivera*, 90 F. Supp. 2d 1338, 1343 (S.D. Fl. 2000) (observing that a court should consider a defendant's ties to the community in which he faces prosecution).  In this case, Defendant has no ties whatsoever to the Western District of Pennsylvania where this case is pending.

The Court recognizes that Defendant has long-standing ties to Nogales, Arizona and her other immediate family members currently live there.  Despite Defendant's ties to that community, the Court cannot discount that she has family ties to Mexico (as the Pretrial Services Report indicates that her living siblings all reside there) and she routinely travels there.  Defendant explained that she travels to Mexico two times per month to attend her husband's medical appointments and obtain his medications.  Contrary to Defendant's reported twice monthly travel, records from United States Customs and Border Protection show that she traveled from Mexico to the United States a total of 97 times in the 16-month period from May 20, 2019 to September 1,

2020. (*See* Docket No. 520-5). In this Court's estimation, 97 international trips in 16 months qualify as frequent international travel. While the Court understands that individuals who live in close proximity to the border may travel to Mexico to shop, dine and vacation as noted in Mayor Garino's letter, the Court agrees with others which have held that frequent international travel, in conjunction with other relevant factors, supports a finding that an individual is a flight risk. *See e.g., United States v. Yusuf*, Crim. No. 4:19-CR-271-SDJ, 2020 WL 607105, at *6 (E.D. Tex. Feb. 7, 2020) (concluding the defendant was a flight risk because he represented his travel as infrequent but he had taken at least thirteen international trips in the past four years, which the court observed cannot be accurately described as "infrequent" travel "[b]y any metric"); *United States v. Ortiz*, Crim. No. 11-251-08, 2013 WL 247226, at *7 (E.D. Pa. Jan. 23, 2013) (concluding that a defendant charged with serious drug offenses who lived in Puerto Rico and traveled to Mexico on three separate occasions in the eighteen months preceding his arrest was a flight risk). Here, Defendant's frequent international travel, in conjunction with her lack of any ties to this District and the substantial term of incarceration she faces if convicted, cause this Court to conclude that she presents a flight risk.

The Court recognizes and appreciates that Defendant's daughter, Brigett Murrietta, is willing to serving as a third-party custodian for her, but has serious concerns about such an arrangement, regardless of who would assume that role. Although Defendant's daughter clearly cares deeply for her and is surely well-intentioned, the mere fact that her daughter is willing to serve as a third-party custodian does not mean that she, or anyone else, could adequately supervise a defendant who is charged with an extremely serious drug trafficking offense. *See United States v. Bey*, Crim. No. 15-87, 2015 WL 7176340, at *5 (W.D. Pa. Nov. 13, 2015) ("[T]he mere fact that a relative or other individual is willing to serve as a third party custodian for a defendant is

not sufficient to justify release on such conditions but is among the factors to be considered when evaluating whether release or detention is appropriate in a given case.").

The Court also recognizes that it must consider all possible conditions of release, such as electronic monitoring as suggested by Defendant.   As discussed, Defendant allegedly was connected with a DTO involving more than 100 kilograms of cocaine and large sums of drug proceeds and, at 49 years old, she is now exposed to a minimum term of ten years' imprisonment. In light of the nature of the charged conspiracy and the substantial penalty Defendant faces if convicted, this Court is not persuaded that any amount of bond, electronic monitoring or other means of personal supervision would deter her from fleeing.  *See Chagra*, 850 F. Supp. at 359-60 (given that the defendant faced minimum term of 20 years' imprisonment on drug conspiracy charge, the conspiracy involved large sums of cash, and evidence suggested that he had contacts in Mexico related to his illegal drug activities, the court was not satisfied that any possible conditions of release would reasonably assure the defendant's appearance, as "[e]lectronic monitoring and other means of personal supervision . . . only notify authorities that the defendant is already fleeing").

Overall, when considering Defendant's history and characteristics (most notably, no ties to the Western District of Pennsylvania, frequent international travel and employment status/financial obligations), this factor weighs in favor of pretrial detention.  *See e.g., United States v. Ruiz-Corral*, 338 F. Supp. 2d 1195, 1198 (D. Colo. 2004) (concluding defendant was a flight risk and revoking magistrate judge's release order, despite that defendant was a United States citizen, had no prior felony convictions, was described as a "dutiful employee" who held a job for five years, had ties to the community and agreed to post his home as security for the bond to secure his appearance, where he was indicted for serious drug conspiracy and weapons charges and had

significant family ties to Mexico).

D. <u>**Nature and Seriousness of Danger to Any Person or the Community if Released**</u>

The final factor requires consideration of the nature and seriousness of danger to any person

or the community if Defendant is released.  As to this factor, the Court recently explained in the

case of one of Defendant's co-conspirators that:

> [it] agrees with others which have observed that drug trafficking poses a substantial risk of harm to the community, particularly the trafficking of significant quantities of a dangerous, addictive drug such as cocaine as alleged to have occurred here.  *See Bastianelli*, 2020 WL 1015269, at *8 ("Drug trafficking certainly poses a substantial risk of harm to the community, particularly the trafficking of significant quantities of very dangerous and addictive drugs [ ]."); *United States v. Gibson*, 481 F. Supp. 2d 419, 423 (W.D. Pa. 2007) ("[V]iolence is not the only danger to the community this court must consider. The court must also consider the danger of trafficking in illicit drugs.").   Distribution of Schedule II controlled substances like cocaine have a "high potential for abuse" and that abuse "may lead to severe psychological or physical dependence."  *See Bastianelli*, 2018 WL 1015269, at *8 (citing 21 U.S.C. § 812(b)(2)(A), (C)).  Accordingly, the high volume of cocaine allegedly trafficked in this case presents a considerable danger to the safety of the community.
>
> Ultimately, consideration of this factor requires a court to "*predict* whether defendant will engage in drug trafficking if released pending trial."  *United States v. Bratcher*, Crim. No. 14-28, 2014 WL 1371582, at *8 (W.D. Pa. Apr. 8, 2014) (emphasis in original) (citing *Perry*, 788 F.2d at 114 ("[T]he dangerousness determination involves a prediction of the detainee's likely future behavior.").[11]  The Court recognizes, as others have, that strict conditions of release, including conditions such as home confinement and electronic monitoring, cannot guarantee that a defendant will no longer engage in criminal activity.  *See e.g.*, *Bastianelli*, 2018 WL 1015269, at *8 (citing *United States v. Yarbough*, No. 2:14-cr-270-11, 2014 WL 7343839, *4 (W.D. Pa. Dec. 23, 2014) ("If released to home detention, nothing prevents Defendant from continuing to engage in illegal activity.").

*United States v. Araiza-Vega*, Crim. No. 20-218, 2020 WL 6546136, at *8 (W.D. Pa. Nov. 6,

---

[11]     Given this case law explaining that the dangerousness determination involves a *prediction* of a defendant's likely future behavior, Defendant's reliance on statistics showing that the majority of those released on bond in 2019 were not re-arrested and appeared for trial is not necessarily relevant to the Court's consideration of this particular Defendant's specific situation and prediction of her likely future behavior.  (*See* Docket Nos. 445-2; 467 at 6).

2020).

These observations concerning the substantial risk of harm to the community posed by cocaine trafficking equally apply in Defendant's case.  Although the Government's evidence does not indicate that Defendant trafficked cocaine but rather transported the financial proceeds from the DTO's cocaine distribution, one who transports drug proceeds serves a critical function in the ongoing operation of a drug trafficking conspiracy.  The Court is not persuaded by Defendant's argument that she cannot resume her alleged role as a courier of drug proceeds because the co-conspirators with whom she allegedly communicated are under indictment and incarcerated.  (*See* Docket No. 467 at 5).  While it is true that Bravo is currently detained, Silvestre has not been apprehended at this juncture and there is no information concerning his whereabouts or activities. All told, based on the serious nature of the charge here, along with all of the other factors the Court has considered, the Court finds that the weight of the evidence is such that Defendant's release on bond would pose a serious risk of her continued drug trafficking activities.  As such, this final factor weighs in favor of pretrial detention.

In sum, after considering the record as a whole, including the nature and circumstances of the serious drug offense charged, the weight of the evidence against Defendant, her history and characteristics, the nature and seriousness of danger to the community posed by Defendant's release, and the rebuttable presumption, which retains evidentiary weight, there is no condition or set of conditions which will reasonably assure that Defendant will not engage in drug trafficking activity while on release pending trial or that she will appear as required.  Accordingly, detention must be ordered.

**IV.** **CONCLUSION**

Given the Court's finding that no condition or combination of conditions will reasonably assure Defendant's appearance as required and the safety of the community if she is released, the Court will lift its stay of the order of release entered by Magistrate Judge Markovich in the District of Arizona on September 10, 2020, grant the Government's motion seeking revocation of the release order, revoke Defendant's bond and order that she shall be detained pending trial or other disposition of this matter.

An appropriate Order follows.

*s/ W. Scott Hardy*
W. Scott Hardy
United States District Judge

Dated: January 14, 2021

cc/ecf:  All counsel of record
         United States Marshal